**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ASHLEY SHAWNESE JOHNSON,** | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | NO. 23-3929 SWR |
| **SAGE DINING SERVICES, INC.,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

**OPINION**

SCOTT W. REID                                          November 6, 2024
UNITED STATES MAGISTRATE JUDGE

**I.    *Introduction***

Plaintiff, Ashley Shawnese Johnson, filed the present action against her former employer, Sage Dining Services, Inc. ("Sage"), alleging violations of the Americans with Disabilities Act ("ADA") 42 U.S.C. § 1201 et seq., the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons.Stat. Ann. §§ 951 et seq., and the Family Medical Leave Act ("FMLA") 29 U.S.C. § 2601 et seq.

Johnson claims Sage failed to provide her with reasonable accommodations and retaliated against her under the ADA and PHRA and denied her leave under the FMLA. Sage filed a motion for summary judgment under Federal Rule of Civil Procedure 56(c) on all claims. Johnson now concedes she was ineligible for leave under the FMLA. For the reasons set forth below, Defendant's motion will be granted in part and denied in part. It is granted with respect to the retaliation claims, denied as moot with respect to the FMLA claim, and denied with respect to the failure to accommodate claims.

II.   *Factual Background*[1]

Sage hired Johnson as a Prep Cook/Line Server ("Prep Cook") at Friends Central School ("Friends Central"). Doc. No. 20-1 at 3. Sage provides dining services to Friends Central, including staffing the location with several employees to perform tasks related to serving school lunches. Doc. No. 20-1 at 2. Johnson predominantly serviced the deli counter, salad bar, and supported other areas of the kitchen in preparation for and during lunch service at the school. *See generally,* Doc. No. 20-1.

Johnson has history of chronic illness related to a condition known as Hidradenitis Suppurativa ("H.S."). Doc. No. 20-1 at 7. Since she was a child, she has experienced flare ups of this condition which include swelling, open wounds, and boils. Doc. No. 20-7 at 77. Sometimes the boils or wounds would leak bodily fluid. Doc. No. 20-7 at 77.

In or around January 9, 2023, Johnson called out of work. Doc. No. 20-14 at 2. Three days later, on January 12, Food Service Director Amanda Musto entered a ticket into Sage's Human Resources ("HR") system, stating Johnson had called out of work three days in a row. Doc. No. 20-14 at 2. Sage Benefits Specialist Naya Whitley and Benefits Manager Justin McPherson responded that they would send leave of absence information to Johnson, because calling out of work for three consecutive days initiates a leave of absence under Sage's policy. Doc. No. 20-14 at 2-3.

On January 12, Whitley sent Johnson a packet of information regarding taking a leave of absence. Doc. No. 20-15; Doc. No. 20-16. Johnson stated she never received the packet via email or regular mail. Doc. No. 20-7 at 90:18, 92:3. She acknowledged that the email could have remained unread in her inbox. Doc. No. 20-7 at 91. The paperwork stated Johnson was not

---

[1] Where there is a dispute, facts are construed in favor of Johnson, as the non-moving party, except where both parties' versions are set forth.

qualified to take FMLA leave because she had yet to work the requisite number of hours. Doc. No. 20-7 at 94:17; Doc. No. 20-15. Instead, Sage offered an unpaid leave of absence. Doc. No. 20-15. Sage requested that Johnson respond with whether she would like to take a leave of absence by January 27. Doc. No. 20-15. Johnson did not do so. The only communication between Johnson and Sage in the days following her hospitalization was a few text messages and calls between Johnson and Musto. Doc. No. 20-7 at 85:7-8. Johnson never returned to work following her hospitalization.

On February 14, Johnson's doctor, Benjamin Larson, MD, wrote a letter requesting that Sage excuse Johnson's absences from work due to her illness. Doc. No. 20-17. On February 21, Dr. Larson sent the first request for accommodations: Johnson could return to work with "light duty accommodations" including no lifting and prolonged standing. Doc. No. 20-14 at 3; Doc. No. 20-18 at 2. After receiving the note, Whitley reached out to Dr. Larson's office and asked what he considered to be "light duty" and for how long Johnson would need accommodations. Doc. No. 23-3 at 36: 9-11. An employee at Dr. Larson's office told Whitley the doctor would send a follow-up note. Doc. No. 23-3 at 37:1-4. Sage District Manager, Colin Abernathy logged a message in the system in response to the request:

> We would not be able to accommodate her in her normal role. The only thing we could offer is a part-time cashier position, but even that would require some lifting (to restock items). Does she have a weight limit for the light-duty lifting? Or is it no lifting at all?

Doc. No. 20-14 at 3.

Whitley responded that Dr. Larson had not provided a weight limit for Johnson's restrictions and asked whether the cashier position was on-call or part-time. Doc. No. 20-14 at 3. Amanda Musto responded:

> It is a part-time position with only 2-3 hours a day during our lunch period but there is lifting involved with this as well as standing during the service time. With having a no

lifting stipulation, I do not think this would work to be safe. Also, as a side [note] I have received information from my team members (secondhand information) that she is upset with SAGE and how things were handled while she was out as though we "did not care". Also, that when she comes back if she injures herself further that we will be hearing from her lawyer. I feel as though from these comments that her attitude and professionalism will not be what is expected of our SAGE team members.

Doc. No. 20-14 at 3. Whitley responded that she would notify Johnson that she would "not be able to come back at this time due to her restrictions" on February 24. Doc. No. 20-14 at 3.

On March 20, Sage documented a new request from Johnson. Doc. No. 20-14 at 4. A new letter from Dr. Larson, dated March 15, stated that he recommended Johnson remain out of work until March 27, but could then return to work with a lifting restriction of ten pounds and could not use the deli slicer. Doc. No. 20-14 at 4. The message received no response until April 4, when Amanda Musto responded: "We still cannot accommodate this safely with the weight restriction. I did speak to Lori [Beard] about this recently and am awaiting more information." Doc. No. 20-14 at 4.[2]

Later in April, Whitley reached out to Johnson's doctor, who informed her that Johnson would need accommodations until June. Doc. No. 20-14 at 4. She also spoke to Musto about any vacant positions for Johnson, to which Musto replied that "the ones she did have were already filled and that the position [Musto] did have is the position that Johnson was in." Doc. No. 20-14 at 4. Whitley indicated to Musto that Johnson's job was not protected and Musto could fill the position. Doc. No. 20-14 at 4. Whitley noted that if Johnson was cleared to return to work without restrictions and there was an available position that Johnson was qualified for, Musto could place Johnson in that position. Doc. No. 20-14 at 4.

On June 21, Whitley spoke to Johnson via telephone. Doc. No. 20-14. Johnson said Sage told her that someone would reach out after spring break and that she believed Sage "put her on a

---

[2] Lori Beard is a staff attorney for Sage. Doc. No. 20-21 at 31:16-17.

leave, knowing that [Musto] was not returning her back," before hanging up the phone on

Whitley. Doc. No. 20-14 at 8. Johnson testified that when she did not hear from Sage after spring

break, she started to look for other work. Doc. No. 20-7 at 122. In July, Whitley sent a follow up

letter similar to the initial leave request letter, giving Johnson another chance to complete

requested paperwork about her condition and accommodations. Doc. No. 20-14 at 8; Doc. No.

20-20. Johnson was required to return the paperwork by July 27. Doc. No. 20-14 at 8.

When Johnson did not return the paperwork, Whitley wrote in the HR system on August

17 that Sage was "going to close this ticket. [Sage was] going to [terminate]' [Johnson]." Doc.

No. 20-14 at 8. Another entry stated that Johnson was terminated because she did not return from

leave of absence and "ha[d] not returned communication when it comes to her leave of absence."

Doc. No. 20-14 at 10. Johnson filed the present lawsuit on October 11, 2023.

## III. *Legal Standard*

Summary judgment is warranted where the pleadings and discovery, as well as any

affidavits, show that there is no genuine dispute as to any material fact and that the moving party

is entitled to judgment as a matter of law. Fed. R. Civ. Pr. 56.  The moving party has the burden

of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477

U.S. 317, 323 (1986).  In response, the non-moving party must present more than mere bare

assertions, conclusory allegations, or suspicions to show the existence of a genuine issue.

*Jutrowski v. Township of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018).  It is not sufficient to

reassert factually unsupported allegations contained in the pleadings. *Anderson v. Liberty Lobby*,

466 U.S. 242, 249 (1986*); Celotex*, *supra*, at 325.

When ruling on a summary judgment motion, the court must construe the evidence and

any reasonable inferences drawn from it in favor of the non-moving party. *Anderson v. Liberty*

*Lobby*, *supra* at 255; *Tiggs Corp. v. Dow Corning Corp*., 822 F.2d 358, 361 (3d Cir. 1987). Nevertheless, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, *supra*, at 323.

## IV.   *Discussion*

Johnson asserts that Sage failed to provide her with reasonable accommodations and retaliated against her under the ADA and the PHRA[3]. She also alleges Sage denied her right to leave under the FMLA.

### A.   *The Americans with Disabilities Act*

Sage moves for summary judgment on Johnson's failure to accommodate and retaliation claims. Regarding the retaliation claim, the undersigned finds that Johnson fails to meet her burden of establishing a *prima facie* case of retaliation, and therefore summary judgment on the retaliation claim is appropriate. Genuine disputes of material fact exist related to Johnson's failure to accommodate claim, and therefore the I will deny summary judgment on that claim.

#### 1.   *ADA Prohibition of Discrimination*

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *See* 42 U.S.C. § 12112(a).

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that (1) she is a disabled person within the meaning of the ADA; (2) she is

---

[3] The Court reviews Johnson's claims exclusively under the ADA framework because the PHRA is merely the state analog of the ADA. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (stating that "we will only discuss Taylor's ADA claim because our analysis of an ADA claim applies equally to a PHRA claim.").

otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination." *See Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006); *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000); *see also* 42 U.S.C. § 12101.

For the purposes of the summary judgment motion, Sage does not contest that Johnson was disabled within the meaning of the ADA. Sage contests the second and third elements, arguing Johnson is unable to perform the essential functions of the jobs with the requested accommodations and that by providing her with unpaid leave, Sage did not subject her to an adverse employment action. The undersigned finds questions of material fact regarding the essential functions of the positions in question, whether Johnson was able to perform them with reasonable accommodations, and whether Sage engaged in the interactive process in good faith.

### a. Qualified Individual

A qualified individual is someone with a disability, who, "with or without reasonable accommodation, can perform the essential functions of the employment position[.]" 42 USC § 12111. In evaluating whether Johnson is a qualified individual with a disability, the Third Circuit has held that a plaintiff must: 1)"satisf[y] the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.;" and 2) be able to "perform the essential functions of the position held or desired, with or without reasonable accommodations." *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 311 (3d Cir. 1999)(citing *Gaul v. Lucent Technologies, Inc.,*134 F.3d 576, 580). There is no dispute that Johnson satisfies the prerequisites for the position. The critical issue here is whether Johnson could, with reasonable accommodations, perform the essential functions of the Prep Cook or

cashier jobs. The undersigned finds that because a fact question exists regarding the essential functions of both roles, which by extension creates a fact question regarding whether Johnson could perform the essential functions of the roles with a reasonable accommodation. *Reyer v. Saint Francis Country House,* 243 F. Supp. 3d 573, 594 (E.D. Pa. 2017).

### i.   Essential functions

[W]hether a particular function is essential 'is a factual determination that must be made on a case-by-case basis [based upon] all relevant evidence.'" *Reyer,* 243 F. Supp. 3d at 592 (citing *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 612 (3d Cir. 2006) and quoting *Deane v. Pocono Medical Ctr.,* 142 F.3d 138, 148 (3d Cir. 1998)). The Equal Employment Opportunity Commission's regulations defining "essential functions" further state a function may be deemed "essential" because: (i) the reason the position exists is to perform that function; (ii) the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) the function may be highly specialized so that the incumbent in the position is hired for her expertise or ability to perform the particular function. *Id.* (citing 29 C.F.R. § 1630.2(n)(2)).

The regulations further set forth a non-exhaustive list of examples that may assist courts in identifying the "essential functions" of a job: (i) the employer's judgment as to which functions are essential; (ii) written job descriptions prepared before advertising or interviewing applicants for the job; (iii) the amount of time spent on the job performing the function; (iv) the consequences of not requiring the incumbent to perform the function; (v) the terms of a collective bargaining agreement; (vi) the work experience of past incumbents in the job; and/or (vii) the current work experience of incumbents in similar jobs. *Id.;* 29 C.F.R. § 1630.2(n)(3); *see also Skerski v. Time Warner Cable Co., a Div. of Time Warner Entm't Co.*, L.P., 257 F.3d

273, 279 (3d Cir. 2001) (discussing and applying the seven factors). "[N]one of the factors nor any of the evidentiary examples alone are necessarily dispositive." *Skerski*, 257 F.3d at 279.

Sage argues that Johnson cannot establish that she was qualified for the Prep Cook or cashier positions because she could not perform the essential functions of the positions with the accommodations requested by her doctor. At the time of the first request for accommodations (light duty – no lifting; no prolonged standing[4]), Sage evaluated Johnson's ability to return to work in her previous position and the only other position available at the time, the cashier position. Sage determined she could not return to her previous role or transfer to the cashier position because lifting was an essential function of both roles. When Johnson's doctor modified the limitations for the second request for accommodations (no lifting more than 10 pounds; no use of deli slicer), the cashier position was no longer available, so Sage only evaluated whether her previous position could be modified to accommodate the restrictions. Sage determined then that both lifting in excess of 10 pounds and using the deli slicer were essential functions of the role. Johnson contends neither lifting nor use of the deli slicer are essential tasks of their respective positions. After reviewing the record, I conclude that there are genuine issues of material fact regarding the essential functions of both positions.

The job description for the Prep Cook position identifies the following as "essential physical/mental functions and environmental conditions": "properly lift and carry objects weighing up to 20 pounds (frequently), 20-50 pounds (occasionally), and more than 50 pounds (rarely)." Doc. No. 20-9 at 6. Johnson's supervisor Amanda Musto testified that lifting was an integral part of the Prep Cook position. Doc. No. 20-13 at 83:17–83:23. Musto described various

---

[4] Though restricting prolonged standing was included in Johnson's initial request for accommodations on February 21, neither party dedicated more than a few words to whether standing was an essential function of either role. In depositions, several witnesses were asked whether the roles could be performed whilst sitting, but no other mention of standing contributes to either party's arguments.

activities including moving large chunks of cheese and meats to the slicer, as well as moving buckets and restocking different areas. Doc. No. 20-13 at 83:17–83:23. Neither party provided the job description for the cashier position, but Musto, and Alicia Robinson, a cook, who both filled in as cashiers regularly, testified that the cashier's duties included, but were not limited to, stocking products such as beverages and snacks, sanitizing the station using a large sanitation bucket, and carrying trays to the cold lines. Doc No. 20-13 at 26:1–8; Doc. No. 20-11 at 27:1-3.

Although lifting (both in general and in excess of 10 pounds) is identified in the job description for the Prep Cook position and Sage employees described it as a common task of both positions, neither fact is conclusive that lifting is an essential function of either role. *See Deane*, 142 F.3d at 148 (declining to apply "conclusive effect to either the job description or [the employer's] judgment as to whether heavy lifting is essential to [plaintiff's] job"). The applicable regulations, statutes and precedent instruct that the undersigned look to all of the evidence in the record in making the assessment.

During the relevant time period, Sage generally employed around six people at a time at Friends Central, with no other employees serving in the same role as Johnson. Doc. No. 20-7 at 44. The limited number of available employees among whom lifting objects could be distributed supports Sage's argument. *See Reyer,* 243 F. Supp. 3d at 593 (citing *29 C.F.R. § 1630.2(n)(2))*. Musto testified that the Prep Cook was required to lift in excess of ten pounds daily (Doc. No. 20-13 at 36:8), but several employees testified that an employee could ask for help with tasks she was unable to perform. Doc. No. 24-3 at 35:16-18. ("If you knew you could not lift something, you would ask for help."). Musto stated Sage employees work as a team and that there is usually flexibility to switch positions or tasks depending on need. Doc. No. 20-13 at 36:8, 40:9. However, she added that this was not always possible given employee availability or how busy

they were each day. Doc. No. 20-13 at 36:8. Johnson testified that if no other employee was available to help her lift heavy items, she would wait for someone to become available to help. Doc. No. 20-7 at 60: 7-8. Nothing in the record establishes how much time was devoted to lifting on an average day.

Johnson admitted that lifting objects was listed in the Prep Cook job description (Doc. No. 20-7 at 53:16) and testified that most of her tasks that involved lifting were related to moving food supplies from storage to the deli and salad counters. Doc. No. 20-7 at 54:17-55:17, 56:3-10, 57:3-12, 58:7-13, 59:8-11. Robinson testified that Johnson (in the Prep Cook role) and the cashiers never assisted in lifting while other team members were unloading boxes during deliveries. Doc No. 20-11 at 23:5-7 ("The most the cashier would lift was the coffee pot at the end of the day so they could clean. That is it.") No evidence was presented to demonstrate the existence of any consequences that a person in either role would face if they were unable to perform lifting tasks.  Finally, the record does not suggest that the reason either position existed was to lift objects (both in general or in excess of ten pounds) or that Johnson or any cashier was hired for expertise in lifting.

Additionally, viewed in the light most favorable to Johnson, the record could support a conclusion that lifting may be a means for carrying out an essential function of either position rather than the essential function itself. " *Reyer,* 243 F. Supp. 3d at 593. I note that "the essential function requirement focuses on the desired result rather than the means of accomplishing it." *Skerski*, 257 F.3d at 280. For example, "in a job requiring the use of a computer, the essential function is the ability to access, input, and retrieve information from the computer. It is not essential that the person be able to use the keyboard or visually read the computer screen"

11

*Reyer,* 243 F. Supp. 3d at 593 (quoting *Skerski,* 257 F.3d. at 281). As such, there is a question as to whether lifting is the means of accomplishing a task rather than a desired result.

Regarding use of the deli slicer, fact questions exist relating to Sage's ability to use pre-sliced meats as an accommodation so that Johnson would not need to use the slicer. Testimony suggested Friends Central school complained about the use of pre-sliced meat in the past, but that was at a time during which there was no one employed in the Prep Cook position. Doc. No. 20-11 at 18; 8. It is unclear whether Sage investigated this as a viable option to enable Johnson to return to work. Further, the role involves several other responsibilities besides the use of the deli slicer, including making sandwiches, preparing the salad bar and cold line, and cleaning. Robinson testified the slicer is only used at most three times during a five-day work week. Doc 20-11 at 17:22-3. Operating the deli slicer may require certain skills, but nothing in the record suggests that Johnson was hired for her skill in using it. It also does not appear that it would burden others to assist her when the slicer was used so infrequently, as many employees stated that helping coworkers was routine. Thus, it remains a question of fact as to whether use of the deli slicer is an essential function of the role.

In conclusion, at least some of the factors identified in 29 C.F.R. § 1630.2(n)(2) might support a finding that lifting and using the deli slicer were not essential functions of the Prep Cook and cashier positions. *Reyer,* 243 F. Supp. 3d at 594. Given that genuine issues of material fact exist, it would be inappropriate to conclusively resolve this question. *Id.*; *See also Skerski,* 257 F.3d at 280 ("consideration of the seven evidentiary examples included in § 1630.2(n)(3) suggests caution against any premature determination on essential functions [when] at least some of them lean in [a plaintiff's] favor.") The issues the undersigned has identified must be resolved

by a jury. *See Turner*, 440 F.3d at 614 ("the fact issue as to 'essential function' must be decided by a jury").

### 2.  *Reasonable Accommodation*

As noted above, the question is not merely whether Johnson could perform the essential functions of the jobs, but rather could Johnson perform the essential functions with the requested reasonable accommodations. "As with the issue of 'essential function,' the issue of 'reasonable accommodation[s]' presents a fact question." *Reyer,* 243 F. Supp. 3d at 593 (quoting *Turner, supra* at 614–15).

Because factual questions remain as to the essential function of the positions, I am unable to determine that Johnson was incapable of performing the essential functions of the positions with reasonable accommodations. *Reyer,* 243 F. Supp. 3d at 594, (citing *Acevedo v. City of Philadelphia*, 680 F.Supp.2d 716, 738 (E.D.Pa. 2010) (recognizing that where a genuine issue of material fact remains regarding the essential function(s) of a position, courts are prevented from addressing the issue of whether a plaintiff could perform those function(s) with or without a reasonable accommodation)).

### a.  *Failure to Accommodate*

The central issue of the failure to accommodate claim is whether Sage, in providing a different accommodation that was not requested by Johnson, complied with its duties in response to Johnson's request. The undersigned concludes that fact questions exist regarding whether Sage engaged in the interactive process in good faith.

"Discrimination under the ADA…includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor*, 184 F.3d at 306. An employer commits unlawful discrimination under the ADA if the employer does "does not mak[e] reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." *Id.* at 311 (citing 42 U.S.C. § 12112(b)(5)(A)).

Johnson requested two distinct accommodations. In consideration of each request, Sage determined that there were no roles available that would allow Johnson to return to work with the limitations recommended by her doctor and decided to extend her unpaid leave. Sage argues unpaid leave constitutes a reasonable accommodation that is permissible under the law of this Circuit.

Based on these facts, the question becomes whether unpaid leave is a reasonable accommodation when it is provided after the employer denies alternate accommodations through which the employee would still be paid. *Drapikowski v. Malvern Inst., Inc.*, No. CV 21-39, 2021 WL 5711827 at *5 (E.D. Pa. Dec. 1, 2021). While it is true that an employer is not obligated to provide the reasonable accommodation requested or preferred by the employee if another reasonable accommodation is instead provided, (*See Kortyna v. Lafayette Coll.*, 47 F. Supp. 3d 225, 242 (E.D. Pa. 2014) (citing *Yovtcheva v. City of Phila. Water Dept.*, 518 F. App'x 116, 122 (3d Cir. 2013)); *Solomon v. Sch. Dist. of Phila.*, 882 F. Supp. 2d 766, 779 (E.D. Pa. 2012)) and that in some instances, unpaid leave does constitute a reasonable accommodation, (*Brady v. United Refrigeration, Inc.*, Civ. A. No 13-6008, 2015 WL 3500125, at *12 (E.D. Pa. June 3, 2015); *Aspen v. Wilhelmsen Ships Serv.*, Civ. A. No. 13-6057, 2015 WL 1020660, at *5 (E.D. Pa. Mar. 9, 2015), the analysis "turn[s] on whether the interactive process that led to the employee taking unpaid leave was conducted in good faith." *See Drapikowski* No. CV 21-39, 2021 WL 5711827 at *5 (citing *Blassingame v. Sovereign Sec., LLC*, Civ. A. No. 17-1351, 2017

WL 3390199, *10 (E.D. Pa. Aug. 7, 2017) (declining to dismiss ADA discrimination claim when defendant refused to transfer plaintiff and instead placed her on unpaid leave because "such allegations allow for the reasonable inferences that ... [defendant failed] to engage in the interactive process"); *Mills v. Temple Univ.*, 869 F. Supp. 2d 609, 624 (E.D. Pa. 2012) ("[Defendant's] offer of unpaid leave does not establish, as a matter of law, that it acted in good faith.")). The undersigned finds a genuine issue of material fact exists as to whether Sage engaged in the interactive process in good faith.

i.    *The Interactive Process*

To establish that an employer breached its duty to provide a reasonable accommodation, a plaintiff must establish that (1) the employer knew about her disability; (2) she requested an accommodation or assistance; (3) the employer did not make a good faith effort to assist; and (4) she could have been reasonably accommodated.'" *Capps v. Mondelez Global*, LLC, 847 F.3d 144, 157 (3d Cir. 2017)(citing *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F. 3d 240, 246 (3d Cir. 2006)). *Taylor*, 184 F.3d at 319-20.

"Reasonable accommodation" further "includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith under what has been termed a duty to engage in the 'interactive process.'" *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004). "Once an accommodation is requested, the employer is required to engage in the interactive process during which the employer and employee identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome them." *Bielich v. Johnson & Johnson, Inc.*, 6 F.Supp.3d 589, 617 (W.D. Pa. 2014); *Armstrong*, 438 F.3d at 246 ("if an employer has adequate notice of an employee's disability, and the employee requests accommodations for the disability,

it becomes the responsibility of the employer to engage the employee in the interactive process of finding accommodations"); *see also* 29 C.F.R. § 1630.2(*o* )(3) ("To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."). More specifically:

> The interactive process is aimed at determining what reasonable accommodations, if any, can address the employee's disability. The interactive process requires a great deal of communication between the employee and the employer, as both parties "bear responsibility for determining what accommodation is necessary. Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome A failure to communicate, either by way of initiation or response, may be an act of bad faith.

*Reyer,* 243 F. Supp. 3d at 595-6 (quoting *Sharbaugh v. W. Haven Manor, LP*, 2016 WL 6834613, at *9 (internal quotations and citations omitted).

Sage contends that the undisputed evidence demonstrates both that Sage engaged in the interactive process in good faith and that Johnson caused the breakdown of the process. Sage supports its argument with evidence that (1) Sage communicated with Johnson and her doctor about her requests for accommodations and ability to return to work; (2) when presented with the requests, Whitley reached out to Musto, Abernathy, and other Sage representatives to determine if such restrictions could be accommodated; and (3) following internal analysis and discussion, it was determined that no reasonable accommodation existed that would have allowed Johnson to fulfill the positions' essential functions with those restrictions. *Reyer*, *supra* at 596.

Viewed in the light most favorable to Johnson, the evidence could reasonably support a conclusion that Sage did not "meaningfully" discuss the restrictions either amongst themselves

or with Johnson. *See Reyer,* 243 F. Supp. 3d at 596. Musto testified that she at first communicated with Johnson via text message but could not recall whether she ever discussed the requests with her. *Id;* Doc. No. 20-13 at 39:20. Although Musto claimed that she discussed the restrictions with a staff attorney, no evidence exists relating to the substance or outcome of that conversation. Johnson was not invited to the school or any Sage meetings to discuss her accommodations or other possible ways Sage could try to accommodate her. Doc. No. 20-13 at 53:8. HR status notes indicate the only person who spoke to Johnson or her doctor about the accommodations was Naya Whitley. Doc. No. 20-14. Whitley lacked any intimate knowledge of the requirements of the jobs and had to consult with Musto and those who had more familiarly with the positions to learn whether Sage could accommodate Johnson. The status notes demonstrate the extent of any discussion regarding Sage's ability to provide Johnson's requested accommodations was a decision made by 1-2 people and a communication to Johnson that she could not return to work.

Sage states Johnson's limitation was "clear" and "[spoke] for itself," seemingly implying there was no need for a more extensive exploration of Johnson's requests. Doc. No. 24 at 3. Given the requirements for employers to show they engaged in good faith in the interactive process, Sage presents very little evidence to show they did so. Considering this evidence, a reasonable jury could conclude that Defendants' response to the restrictions was limited and insufficient to satisfy their obligation to engage in the interactive process.

Sage argues that Johnson caused a breakdown in the interactive process, discussing Johnson's minimal communication with Sage after the March request. Doc. No. 20-2 at 12. Johnson claimed she was told that Sage would contact her after the school's Spring Break to further discuss the possibility of her return to work. Doc. No. 20-14 at 8. When she did not hear

17

from Sage, she began to look for other work. Doc. No. 20-14 at 8.  Whitley said Sage was informed by Dr. Larson's office that Johnson would need accommodations until June, which was the next time Sage reached out to Johnson. Doc. 23-3 at 43:10-15. Whether there was a misunderstanding between Sage and Johnson is unclear, but such a miscommunication could explain why communication slowed between the parties in the Spring. Accordingly, a reasonable jury could find that Sage's unclear communication to Johnson was the cause of the breakdown of the interactive process.

Viewed in the light most favorable to Johnson, the foregoing evidence is sufficient to permit a reasonable jury to conclude that Sage failed to fulfill their obligation to participate in the interactive process. Additionally, there are genuine issues of material fact as to whether the unpaid leave was a reasonable accommodation and would have enabled Johnson to perform the essential functions of her job. For these reasons, summary judgment with respect to Johnson's failure to accommodate claim is not appropriate.

### 3. ADA Prohibition of Retaliation

The ADA also prohibits employers from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by this chapter, or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

Johnson claims Sage retaliated against her for requesting a reasonable accommodation by "constructively suspending her without pay and terminating her employment." Doc. No. 23-2 at 7. Retaliation claims under the ADA asserted in the absence of direct evidence of an adverse

employment decision based on protected activity revert to the McDonnell Douglas framework.[5] *Gavurnik v. Home Properties, L.P.*, 227 F. Supp. 3d 410 (E.D. Pa.), *aff'd,* 712 F. App'x 170 (3d Cir. 2017) (citing *LaRochelle v. Wilmac Corp.*, Civ. A. No. 12–5567, 2016 U.S. Dist. LEXIS 133135 at *82, 2016 WL 5404474 at *22– 23 (E.D. Pa. Sept. 27, 2016)).

To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) she engaged in a protected activity; (2) an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *Id.* (citing *Ptasznik v. Univ. of Pa.*, 523 Fed.Appx. 156, 160 (3d Cir. 2013); *see also LaRochelle*, 2016 U.S. Dist. LEXIS at *82, 2016 WL 5404474 at *22–23. The first element is not in dispute, as "The right to request an accommodation in good faith is a protected activity under the ADA." *See Wilkie v. Luzerne County*, No. 14-cv-00462, 2016 WL 4921032, at *8 (M.D. Pa. Sept. 14, 2016) (citing *Shellenberger*, 318 F.3d at 191).

Johnson argues that both unpaid leave and termination are adverse employment actions. Sage disputes that Johnson suffered an adverse action, as it believes the unpaid leave to be a reasonable accommodation and therefore not adverse. [6] As discussed above, a fact issue exists as

---

[5] Under the McDonnell Douglas burden-shifting framework applicable to ADA discrimination claims, the initial burden of production is on the plaintiff to show a prima facie case; once the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection, and finally, the plaintiff is afforded a fair opportunity to show that the defendant's stated reason for the plaintiff's rejection was in fact pretext. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Americans with Disabilities Act of 1990, § 2 et seq.,

[6] Sage argues that because Johnson receives full Social Security benefits and has been "deemed disabled" by the Social Security Administration, she is unable to assert that she was able to perform the essential functions of her position with a full disability after her leave of absence and therefore the Retaliation claim must fail. Doc. No. 24. The Benefit Verification Letter from the Social Security Administration states that Johnson is considered disabled for the purpose of receiving benefits since February 26, 2021. Doc. No. 23-3 at 313. Third Circuit Court precedent requires that an individual must "explain the apparent inconsistency" between her receipt of disability benefits and her claim that she is a qualified individual under the ADA. *Motley v. NJ State Police*, 196 F.3d 160, 166 (3d Cir. 1999). Johnson disputes that she receives full Social Security Benefits. Doc. 23-1 at 9, Doc. No. 23-2 at 18. The undersigned finds that the Benefit Verification Letter shows that Johnson was eligible for full benefits and therefore

to whether the unpaid leave of absence constitutes a reasonable accommodation. However, for the purposes of this analysis, assuming that unpaid leave is an adverse employment action, Johnson's retaliation claim still fails as she cannot establish a causal connection between her requests for accommodations and Sage's decisions to place her on leave and later terminate her employment.

*a.    Causal Connection*

"Whether there is a causal nexus between the protected activity and the adverse action is a totality-of-the-circumstances inquiry." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015). Johnson must establish a causal connection by (1) demonstrating an inference of causation through temporal proximity between the protected conduct and the adverse action, in which case the timing must be "unusually suggestive" of a retaliatory motive; or (2) demonstrating "'any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting' a retaliatory animus." *Carpenter v. York Area United Fire & Rescue*, 2020 U.S. Dist. LEXIS, 67650, at * 19 (M.D. Pa. Apr 17, 2020) (quoting*, LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)). "[T]he timing of alleged retaliatory conduct can, by itself, support a finding of causation only when temporal proximity between the protected activity and adverse action is unduly suggestive." *McGhee v. Thomas Jefferson Univ. Hosp.*, No. 12-cv-02919, 2013 WL 4663541, at *6 (E.D. Pa. Aug. 29, 2013) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F. 3d 294, 307 (3d Cir. 2012)) (internal quotation marks omitted).

---

needed to provide an explanation for such inconsistency. However, because Johnson is unable to establish a *prima facie* case on the merits of her claim, this issue is moot.

Case 2:23-cv-03929-SWR   Document 30   Filed 11/06/24   Page 21 of 23

*i.  Temporal Proximity*

Johnson fails to demonstrate that the temporal proximity between her requests for accommodations and being placed on unpaid or terminated was unusually suggestive of retaliatory motive. The parties agree that Johnson was placed a leave of absence on January 12, 2023. Johnson was initially placed on leave more than one month before the first request and terminated on around six (6) months after the February request or five (5) months after the March request. As a matter of law, the temporal proximity here is not unusually suggestive. See *Williams*, 360 F. 3d at 759 (holding that a termination occurring two (2) months after a request is not "unusually suggestive"); *Oden v. SEPTA,* 137 F. Supp. 3d 778, 791 (E.D. Pa. 2015) (finding that five (5) months is not "unduly suggestive" timing of retaliatory motive).

*ii.  Retaliatory Animus*

As discussed *supra*, if the temporal proximity is not unusually suggestive, Johnson can proffer other evidence such as "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *See LeBoon*, 503 F.3d at 232–33. Johnson fails to demonstrate "actual antagonistic conduct or animus against the employee" or any inconsistencies sufficient to give rise to an inference of causation. *Marra v. Phila. Hous. Auth.*, 497 F. 3d 286, 302 (3d Cir. 2007). In fact, the evidence suggests the opposite.

When the first decision was made to place Johnson on leave, Justin McPherson instructed Naya Whitley that Sage "give[s] team members a period of time between each communication," while on leave, indicating that although Sage had not heard from Johnson, they would be affording her extra time to respond since she was on leave. Doc. No. 20-14 at 3. He added, "if the team member does not complete or comply with the communications, HR will process a

termination." Doc. No. 20-14 at 3. This policy, coupled with several months of waiting for Johnson to return to work, demonstrates an overall a lack of animosity or antagonism. Johnson failed to provide any evidence of actions or comments by Sage supervisors and managers that would suggest animus directed toward Johnson.  Accordingly, the trier of fact could not conclude, as a matter of law, that retaliatory animus on the part of the Sage played a role in the decision-making process which had a determinative effect of the outcome of that process. *See Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 501 (3d Cir. 1997). The Court finds that the undisputed evidence of record would not permit a reasonable factfinder to conclude that Sage's reason for placing Johnson on leave and terminating her employment was retaliatory. The Court will grant Sage's motion for summary judgment as to the ADA retaliation claims.

     *B.  FMLA Interference*

In the Complaint, Johnson alleged that Sage failed to provide her with FMLA leave. Doc. No. 1 at 6. Sage addressed this claim in its motion for summary judgment (Doc. No. 20-2 at 15), but in her response to Sage's motion, Johnson conceded that she did not work the requisite number of hours to qualify for leave under FMLA. Doc. No. 23-2 at 19. Given Johnson's concession, Sage's motion for summary judgment shall be denied as moot and the FMLA Interference Claim is dismissed.

**V.**    *Conclusion*

For the foregoing reasons, the Court grants Defendant Sage's motion for summary judgment on the ADA and PHRA retaliation claims. The Court denies the motion as moot regarding the FMLA Failure to Provide Leave claim and denies the motion on the ADA and PHRA Failure to Accommodate claims. An appropriate Order follows.

BY THE COURT:

*s/Scott W. Reid*
_____

**SCOTT W. REID**
**U.S. MAGISTRATE JUDGE**